Peifer v. Pennsylvania Board of Probation and Parole You may. You have three minutes until it's good afternoon. I was going to say I was going to guess on that, but thank you. May it please the court. Good morning, your honors. My name is David Kohler, and I represent the plaintiff below the appellant Samantha Peifer in this appeal. May I please reserve three minutes for rebuttal? You may. Thank you. Your honors, it should not be this onerous for a 29-year-old pregnant female parole officer diagnosed with MS who asked to do almost all of her job, but with an accommodation for a few months at the beginning of the COVID pandemic in March of 2020. When other parole officers were not in the office to get to a fact finder to have her claims of pregnancy discrimination and retaliation heard. The district court erred in several regards. Before I get them, there are two basic, simple tenants of law that govern here. Number one, we can all agree and accept that the denial of an accommodation request is an adverse employment action. Even if it is subsequently remedied, if it takes the filing of a lawsuit or a charge of discrimination, that does not allow for the escape from liability. Number two, we can all agree that case law says that pregnant individuals requesting accommodation must be treated not better, not worse, but the same as disabled individuals requesting accommodations with the same limitations. The district court erred in a number of regards, most notably in finding that appellant did not suffer an adverse employment action. I'll get into that in a little bit more detail in a second. Second, the error of the district court was numerous in something that's so simple procedurally at the Rule 56 stage. The district court did not view the facts in the light most favorable to the plaintiff. In fact, I can rattle off, I think off the top of my head, about eight facts that were viewed in the light least favorably to the plaintiff. And that's where I go back to my initial point that it shouldn't be this onerous under these facts for this client of mine, this lady, to appear for a fact finder to determine her claims. Mr. Kohler, we had asked for some supplemental briefing on the question of the case law that's out there that seems to support the notion, at least in a retaliation context, that involuntary unpaid leave constitutes an adverse employment action, regardless of whether there is eventually back pay and reinstatement. You have argued that you didn't forfeit that particular argument, but you also acknowledge that you didn't explicitly lay it out as an individually actionable claim in the district court, and that you have not argued it as a discrete adverse employment action in your opening brief on appeal. So what is the argument that is preserved? Thank you, Your Honor. The facts and the record of this case clearly demonstrate that on several occasions, Ms. Pfeiffer made requests for an accommodation, starting in March 20th of 2020. And she was met not only by her supervisor, but by the Eastern Regional Director. Those are the two individuals that we deposed with, no, we do not accommodate pregnant employees here. We only accommodate folks who are injured on the job or people who are subject to some type of disciplinary investigation. My position, Your Honor, is that that policy almost ends the inquiry. That's a violation of the law. You are admitting treating pregnant employees differently than non-pregnant employees. So respectfully, I don't even think I have to get to that next level of analysis that the court asked us to brief in supplemental briefs. However, I gave you that as background. To answer your question precisely, assuming I need to get there and answer whether an unpaid leave of absence is an adverse employment action, the case law is clear that it is, and I would argue that that argument is absolutely preserved on this record, because it's encapsulated by my basic presumption or basic argument that once you have both your folks who were deposed, the supervisor and the Eastern Regional Director, admit a violation of the law, they're acknowledging that they did not accommodate Samantha Pfeiffer. But they ultimately did. They granted her modified duty as she had requested. So is your argument that it is a delay in providing accommodation constitutes an actionable failure to accommodate? Yes, because you have to understand, Your Honor, why they did. They did only after she exhausted ‑‑ I mean, she was as great as a client that I've ever seen in following up. I mean, there were, I can probably outline for you five or six that you've seen in the briefing, attempts for her to get them to reconsider. Where would you draw the line if your argument is that the delay in providing that modified duty is itself a failure to accommodate? What if it's a delay of an hour? I don't think it's a timing issue. I think it's a motive issue, and I think it's the total context, and I think the case law that the court pointed out and that we were briefed on in our supplemental brief is consistent with that. I think that the issue here is that she had to file an EEOC charge of discrimination. Title VII and all the anti‑discrimination statutes, they want to encourage employers to correct mistakes or wrongs. I've heard a couple counsel here in the previous two arguments acknowledge mistakes. We all make mistakes. They don't want to deter that from happening. However, the case law is pretty clear that if you do it in the face of someone having to sue, then that's where the line is drawn. So I can't necessarily ‑‑ this was a period of about two months, Your Honor, but I don't really delineate it by the time. I think an hour, I guess I would have a hard time arguing in front of you if it was, you know, an hour. Here it was two months. The other place where I delineate it is the impact on my client. It's, like, very academic and not pragmatic and realistic to say no reduction in pay. I mean, there's arguments here. I was going to get into them of all the facts that the court viewed in the light least favorable to the plaintiff, but, you know, the argument simply by the defendant, Apelli, is there was no significant change in anything once we corrected it. No harm, no foul. The reality is she testified very credibly that this impacted her. She was pregnant. She previously suffered a miscarriage. She just had a diagnosis of MS. To say also, I just want to clarify, that they gave her the modified duty that she asked for, it's not exactly the way it went down. They forced her on a leave. She then came back after several times of being ignored with a doctor's note that listed all the essential functions of the job and which ones she could do and which ones she couldn't do for a period of three months. And at that point, only when she raised that she has a disability, MS, did they say, you know what, we're going to classify you as modified duty. And then they became so rigid in their analysis by just saying, you're modified duty, so you have to all of a sudden come into the office and do everything that you wanted to avoid, which is exposure to people during COVID when you're pregnant with a high-risk pregnancy, and sit there at the front desk from 8 a.m. to 5.30 p.m. The only parole officer who had to do that, when juxtaposed that with what was happening a couple months prior, she was on what's called a flexible schedule, like all the other parole officers were. And so I think to answer your question, it's not about timing, Your Honor, it's about the impact that it had on my client, which clearly she testified under deposition emotionally, when you don't know if your job's going to be protected, health insurance, those types of things. It's not as simple as like the generic case law that says no material adverse impact to her terms and conditions of pay, her position. This was leaving someone in limbo at a time that she really needed her employer to step up. They flat out, they didn't even engage in any interactive process, in any type of dialogue with her. These were flat out denies, and at deposition, her supervisor actually said pregnancy is not a disability. It was not until she brought up the MS that they actually offered her the modified duty. Now, my position as I sit here before the court today is that the employer never accommodated her because of pregnancy. So I could say it's been a couple years. They accommodated her once she told them that she was disabled. If just pregnant, they didn't accommodate her. They accommodated her once she notified of the MS. Once she came back to work, she signed an agreement as to modified duty that provided that she would spend the majority of her time in the office. And as to her further request for additional accommodations, the doctor suggested work from home or PPE. And they provided PPE. So how in terms of that period of time when she's back and she's been requesting additional accommodations, how did she not essentially get the things that she asked for? Okay. And with the caveat that the court recognizes and acknowledges in my argument that the failure to accommodate and the violations of the law have already happened because they flat out denied her for pregnancy, the next part of the case and the part of the claims is Your Honor's question. So on two points, you said, number one, she signed an agreement for modified duty. And you also said that's what she wanted. Her doctor, in an effort to try to get an answer because she was flat out being denied, which is not how you treat people who are disabled, which is pregnancy discrimination, if you're just going to flat out say we don't accommodate pregnant people. Her doctor, in an effort, gave this list of most of the things that she was doing, that she testified about this, she was able to do remotely until she gave birth to her baby, which the pregnancy, the delivery date was expected to be August 25th of that year. So she testified that she actually signed, once they changed their mind and offered her this modified duty that they're now trying to pigeonhole her into just creating legal arguments, she testified that she signed it because she didn't have any other options. She exhausted everything she can do. At that point she had filed an EEOC charge, but we all know that the wheels of justice operate slowly. Nothing was happening with the EEOC charge. So she signed, she testified, because she felt like she had to save her job. It was not the way that they're portraying it, which is exactly what she wanted. In fact, in support of her retaliation claim, Your Honor, and her constructive discharge claim, it was the opposite of what she wanted. She wanted, she was concerned about being exposed to COVID and parolees coming in and being in a space with other people. And that's exactly what they did to her, where before they weren't doing that to her. For them to represent that they gave her exactly what she asked for and the court to accept that, it's the exact opposite of what she asked for and the exact concern of what she had, where she's then the only person that's sitting in a front desk. On the second point, Your Honor, this is another fact that was viewed in the light least favorable to the plaintiff. You said work from home or PPE was what the doctor asked for. That's not what the doctor's note said. The doctor's, and this is a fact and dispute that deserves to go to a jury. The doctor's note said that the doctor opined that she should work from home if possible, comma, but if that's not possible, she should be given PPE, right? They basically gave her a face shield. She brought her own mask and gloves they didn't provide. The court accepted the defendant's version or characterization of that doctor's note and the court said the doctor gave a choice. He said work from home or PPE. That's not what happened. And that's where there's another failure that's different from how they treat disabled employees that's evidence of discrimination. Now, you're going to hear the lawyer for the appellee say there's no obligation to engage in the interactive process under the Pregnancy Discrimination Act. And I'm going to tell you that while the law might not say that there is, the law clearly says you have to treat pregnant people the same as you treat disabled people. And the law requires disabled people when they ask for an accommodation for the employer to engage in the interactive process. So here there was no analysis. There was no, is it an undue hardship? There was no analysis as to whether she could work from home on the job functions that she claimed she was doing at the time. She testified that she could do it. All the parole officers had an adjusted schedule. She was the only one required to come in. It was punitive. When you're talking about what the law would require and who she should be compared to, we have under the Pregnancy Discrimination Act, Young says that where we're looking at accommodation, that the appropriate comparator is others similar in their ability or inability to work. Is that the only criterion that should be considered when we're looking at appropriate comparators for accommodation purposes? And does that directive from Young carry over to a straight pregnancy discrimination claim? Thank you for those questions, Rhonda. To answer the second one first, because I think it's easier to answer, the answer is yes. I believe under the four elements of both claims, the way it's phrased under Young is comparators. The way it's phrased under a straight pregnancy discrimination claim is create an inference. But under the discrimination laws, as your honors are aware, the way you show the inference is by comparators. So it does carry over on the comparators. And that's another issue that the facts were viewed in the light least favorable to the plaintiff on the comparator issue. I think that evidence has been presented of a couple of comparators. The defense presents three comparators who are on modified duty because they've labeled Samantha Pfeiffer. They forced this modified duty onto her. And then there was so there was rigidity in their analysis of that. There was no thinking. There was no attempt to accommodate. It was just you are now on modified duty. They're portraying it as what she wanted. I've represented the court. It's the exact opposite of what she wanted. It was putting her in harm's way, according to her. But they're presenting it like that. And then they look at three comparators who are on modified duty to say they were all treated the same way as Samantha Pfeiffer. Our comparators, there was essential staff, which are secretarial or, you know, in nature, which we'll admit obviously are not similarly situated in terms of job title. But it goes beyond that, to answer your first question, because they were considered essential, just like the parole officers. And the essential staff, the secretarial folks whose job duties were to be at the front desk, guess where they were at the time that Sam Pfeiffer was required to sit at the front desk with her modified duty accommodation? They were home. To go back to, is ability or inability to work the only criterion that can be considered for comparators? I mean, the secretaries did different jobs and had different responsibilities in the performance of their jobs than your client. Is that an appropriate consideration, or is it simply that there are other employees who were able to work from home? I think it's an appropriate consideration. I think the job description alone is not enough to determine what an essential function of the job is, and we had testimony of that from those folks. Moreover, the similarity of comparators, Your Honor, in this situation is absolutely a question of fact. The case law is clear on that. We presented a comparator who had no, I just want to read from my notes to make sure I get this right, because the comparator analysis, you kind of have to be, you know, precise about it. She had no, this comparator had no disability and was not pregnant and was a parole officer, it's in the record, but was excused from transporting parolees in person because she was concerned about COVID. Do you know? As to that comparator, we're in the record. Your client submitted a very detailed list of inability or ability vis-a-vis the 94 duties assigned to a parole officer. I could not find in the record, let's say there were 25 things that the doctor said she was unable to perform. I couldn't find anything in the record which detailed that particular comparator, what her inabilities or abilities were vis-a-vis those 94 duties. Because, you know, Young says they have to have the same inability or ability. You know, fear of COVID is not an ability or inability. Right. What we need to focus on is what was that parole officer able or unable to do, and I could not see that in the record. Could you point to a place in the record where I could see that? We don't have a list like my client's doctor provided. What we have is an acknowledgment from the appellee in their papers that she was excused from transporting parolees in person. So my argument is that part of her job that she was asking to do, to not do that was required to be in person, they accommodated her. So that is on your ability or inability to do the work in the sense that it's the same thing that Sam Pfeiffer. She testified in the record how she could perform most of the actual tasks, not what the doctor said, but most of the tasks that she was actually doing before remotely with this flexible schedule. So the comparison is that on the record, they acknowledge that this comparator was excused from basically doing in-person work because of the same fear that Sam Pfeiffer had. What they did was. I think we'll hear from you the rest on rebuttal. Okay, thank you. Thank you. Sure. Good afternoon, Your Honors. My name is Michael Scarrinci. I'm a senior deputy attorney general with the Pennsylvania Office of Attorney General. I'm here representing appellee, the Pennsylvania Board of Probation and Parole. Your Honors, I'd like to start with the January 12th order that you issued because I think that's probably most foremost on your mind. And I'd start by saying the issue that you raised, whether the fact that my client took corrective action, whether that constitutes an adverse employment action, that issue is not preserved for appellate review. The appellant doubly forfeited that issue. Now, don't take my word for it. Take the district court's word. At Appendix 13, the district court said there is no evidence, no any assertion by plaintiff, that going on leave for less than two months specifically was adverse to her appointment. And then again, in the appellant's brief, he did not mention this issue. Again, don't take my word for it. Take the appellant's word for it. As he acknowledged in his letter brief, this issue was not explicitly stated in the opening brief. He said it was incorporated by reference. This court has, under its precedent, a standard of exacting particularity when it comes to preservation. Mr. Skrzynski, we framed the question in terms of involuntary unpaid leave, and you rightly point to this statement made by the district court as to going on leave, that argument not being made. But isn't the essence of their argument that she was denied an accommodation as to modified leave for two months? And then next step, they change their minds, provide the modified leave, and there are additional arguments there about other accommodations that are requested. But, I mean, isn't that really their central argument as to the first portion of that time period? And you in your response brief seem to devote a whole section to that, saying that she was made whole, there's no adverse employment action there. I think the focus of her brief was, yes, about the initial denial, and we pointed out at pages 27 and 28 of our brief, well, you can't take, it was almost as if they did not acknowledge that we took corrective actions. We pointed out, yes, there was an initial denial, but we took corrective action, and that left her without an adverse employment action. And then the other argument that she raised was with respect to this accommodation was really granted because of MS and not because of pregnancy. Those were the explicit arguments that she made. But when we pointed that out in our brief that there was no adverse employment action, the appellant did not even file a reply brief. And I would say also in addition to forfeiture, Your Honor, the issue was affirmatively waived by the appellant because at the district court level, we highlighted that we took corrective action, that we granted the modified duty, we compensated for involuntary leave when she was not being compensated, and then restored her leave time to her, and that we made her whole. That's at page 74, paragraph 16, and again at 234 of the DOC's investigative summary where you said we made her whole. And in response, she said that's undisputed. Can I just ask you how those arguments play out in the discrimination context versus the failure to accommodate context? Because it seems that the making whole after the fact could constitute an adverse action in the discrimination context. But your argument is that it's forfeited. It seems that in the failure to accommodate context, the harm is not whether or not she's made whole later. That's not the harm that's contemplated by the failure to accommodate. It's the initial denial and continued denial. And if that's preserved, does the fact that she was later made whole mean that eventually she was accommodated, or is that similar to the discrimination context where it's sort of that's part of the harm? I think the trouble with that question is the case law is less developed on what we have with young. When they just talk about is there a failure to accommodate or not, where we don't have sort of, I think, within the context of discrimination, there is room for a more workable rule based on the standard being is there a serious intangible harm. I proposed a kind of rule, workable rule, I think, in my letter brief where the court would look at multiple factors about how long the delay would be, what was the type of loss, how significant was it, and what triggered the response, was it an EEOC complaint, internal complaint, or a lawsuit. I think in the context of young, that issue has not been as developed. I think if you were to maybe make an analogy, I know my friend has relied a lot on the ADA, which we said is not really applicable here. In the ADA context, they talk about an unreasonable delay in accommodation. I think you would probably go back and look at those same factors I said in the discrimination context. Well, how long was the delay? What triggered the delay? And I would say also here that Ms. Pfeiffer really did not suffer any appreciable harm. She was made whole in terms of the discrimination context. But your colleague, Mr. Kohler, has argued that the district court didn't appreciate the harms that she was identifying, which are more in the nature of emotional harm, anxiety, living paycheck without the paycheck. Well, just to clarify, there was time that, yes, she was on involuntary leave and not compensated. My understanding is also there was annual and sick time when she would have been compensated. So it was not entirely without compensation. I understand the argument from the appellant being the fact that she was, the specific argument was that she may have been concerned about losing health insurance. But, again, because my client took prompt action within one month of the filing of EEOC complaint, that never came to fruition. But isn't that, in terms of the delay, you know, if there is an action for failure to accommodate in the delay in accommodation, you're saying, well, there's no harm for the same reason, I gather you'd say, with discrimination, she was made whole. But as Judge Chung was observing, with failure to accommodate, that may be different. And I think we're trying to understand, would a harm like, say, emotional harm be cognizable for purposes of liability? You might argue that that has, you know, very little or no damages that go along with it, but that would be for a trier of facts. I think, I mean, like you said in the example you gave to the appellant, there is, I think there's a continuum or a spectrum where you could say, yes, there's been a significant harm, and other cases where it isn't. If there's been a request on a Friday afternoon at 4 p.m. and it's denied, and then Monday morning the employer turns around and says, okay, I'll grant your request, there hasn't been any kind of appreciable harm. And again, I think we look at it at this multi-factor kind of way, if we're going to transfer, you know, from the discrimination claim to the failure to accommodate. Let's look at all these factors and see where along the continuum this falls. And I think it falls a lot closer to Jackson than some of the other cases you cited in your order. Jackson was the UPS worker who was demoted and after three months received the, not a promotion, but returned to her regular position and received back pay. And that was after three months and after an EEOC complaint. So I think the factors are pretty similar where we have two months, one month after the EEOC complaint, there was no lawsuit at that time, and it was not as a significant loss, I think, where you had someone who was demoted and lost pay, whereas, you know, here we have some loss of pay, but it was ultimately compensated and restored to the annual time. But doesn't that go back to the nature of the action? I mean, what you're speaking to would address terms of employment, per se, benefits, salary, which makes sense in the discrimination context. But for a law that is trying to provide for accommodations over time, and particularly, I mean, the Pregnancy Discrimination Act, it's dealing with accommodations with, you know, a population where the condition is changing over time. Yes. Right? So, I mean, the need for accommodations may be evolving. Yeah, I understand. So, I mean, in that context, is it really enough to say that pay afterwards eliminates any harm? I think in this case, yes, because, I mean, she did get – she was home receiving pay, and she was ultimately accommodated. I come back to – I think I have to come back again to this. It's not well-developed, and I would try to look at those factors that I mentioned in the discrimination context and the failure to accommodate along the same lines of was there a kind of unreasonable delay, I think is the best analogy that one can make in this scenario where we don't have a lot of development from the United States Supreme Court on this issue. And our position would be there was not an unreasonable delay, and she did, you know, essentially have eight weeks of paid leave. If we acknowledge that there was an initial denial, but we took prompt action to try to make her whole and acknowledging that that was a mistake at the beginning. If I could also – I'm sorry. On the remote work claim, how do you answer the argument that, well, yeah, you gave her protective gear, but that's not really what she wanted. What she asked for and you wouldn't give her is remote work. Well, I look at what her doctor said. Her doctor said if it's not possible to work from home, then she should be given PPE. We read that as alternative recommendations. And everyone says it was possible. But it wasn't possible because if you look at our comparators, the comparators were three parole agents on modified duty. Regardless of the reason, a person on modified duty has to report to the office, and that applied across the board, whether it was to someone injured in the line of duty or to someone who was on disciplinary investigation or in pregnancy. And part of her duties was the essential duty that she signed parolees in and out of the office. And that was what she agreed to. It was just not possible for her to work from home. And on that work from home claim, because it was not possible, she was not qualified to receive that benefit. And because she was treated the same as all the other agents in the office on modified duty, there's no inference of discrimination. I want to just understand better. I mean, it sounds like you're saying it's not possible because we said it's not possible. It was the board's policy, yes. It's not possible because she was assigned to check people in at the front desk. I mean, the modification of duties that led to her, instead of being out in the field checking people in at the desk, why couldn't those duties be modified in other ways that would have allowed for remote work like the secretary's? Well, for modified duty, it was a matter of policy. It was a policy that went back before COVID. The agents we cited, these were agents who requested that in 2019 and early 2020. So it was just a matter of this is our policy. And as the appellant pointed out during his portion of the argument, this is not a question of reasonableness. It's a question of being treated the same as everybody else, whether the employer treats its employees badly or good. The pregnant employee is entitled to be treated the same. And she was treated the same as everybody else that are similar to her in all material aspects. That's the standard. It's not secretaries who were doing different duties, had different assignments. It's not this other agent who was able to do all her duties except for she asked for an accommodation with respect to one duty. If you look at the doctor's note that you mentioned, it was 23 out of 93 duties that she couldn't do. And among them was forcibly, you know, forcibly disarming an offender. So, you know, I'm sorry, I'm getting afield here. But she was not qualified to work from home because of, you know, this was a matter of board policy. That's my answer to your question. Isn't that the nature of the Pregnancy Discrimination Act, that there needs to be modifications to a policy to ensure that someone, the employee, can have the same benefits as those who are like in their ability to work? Right. That's the standard, similar in their ability or inability to work. And that was the policy here because, again, it was regardless of the reason that you can't fulfill all your job duties or the essential job duties, whether it's because you were injured in the line of duty or you're under investigation, then you have to work on modified duty, which is a desk job. It's desk duty. Then you have to be in the office from 8.30 to 5. And, again, the standard I think that this court has applied has to be similar in all material respects. And these agents, these were parole agents that we presented evidence on, and they were similarly situated in their job functions. So it sounds like in all material respects you don't see the young comparator language as your ability or inability as limiting the considerations that go into an appropriate comparator. I think what they said in young is they can't be reasonably distinguished. And here these comparators can't be reasonably distinguished because they are parole agents who requested modified duty. I don't think we can make a comparison between secretarial staff who have different assignments than parole agents. It's not similar in all material respects. I think in young they looked at young, they had different policies, all these different policies with respect to someone who couldn't do their job because of a DOT problem or had lost their license. We don't have that in this record, Your Honor. Your Honor, I just wanted to touch on a couple other things. In terms of the retaliation, I wanted to just make clear about the timeline here because I think it gets confused sometimes with the appellate. In terms of the retaliation, the first request was a request for modified duty. That was in March of 2020. Then in April of 2020 came the filing of the EEOC complaint. Because of that, there's no question that the modified duty was not in response to anything that the employee did. It preceded the EEOC complaint. So the actions, I mean, it couldn't possibly be retaliation. The only possible retaliation could be the work-from-home request. But as I said earlier with respect to the discrimination, we had legitimate non-retaliatory reasons for denying the work-from-home request. Essentially, that was our board's policy and all other agents were treated the same. If you're on modified duty, you cannot work from home. I just want to also briefly touch on the constructive discharge. None of the factors here are indicative of a constructive discharge. The only factor that comes into play is that there was an alteration on the appellant's job responsibilities, but that was done at her request. Nobody encouraged her to resign. No one threatened her with discharge. The only thing that we've suggested that changed was between May of 2020 when she first came back on modified duty and September of 2020 was that she was approaching closer to a due date. Your Honors, I have nothing further. I'm happy to take any further questions if you'd like. Thank you, Your Honors. Thank you. Thank you. Mr. Kohler. Thank you. Thank you, Your Honors. Just three minutes on rebuttal. You can't find your sheet of notes. Okay. Number one, I think it's clear based on what we just heard from my colleague that the reason why corrective action was taken was because an EEOC charge was filed. Number two, they claim repeatedly that we admitted that they made her whole. It's not in dispute that they paid her, but I think the panel has recognized that emotionally and her testimony supports this. She was impacted by the two months of not knowing what's going to happen and essentially being forced to sign the modified duty assignment, which she also testified she was forced to do that. Number three, counsel just relayed to the panel that my client did not suffer appreciable harm. Again, I think that completely ignores the emotional distress that my client testified about that's clear. Number four, on the EEOC complaints, they attempt in their brief papers to distinguish between the cases from other circuits by arguing that it was conciliation and it wasn't litigation. That's not the case. When you have to resort as an employee to filing an EEOC charge, it's the prerequisite that's required in order to appear in this federal court. You have to file an EEOC charge first. So to represent that that's conciliation, to make it akin to the cases that say, hey, we remedied it, no harm, no foul, is not accurate. Number five, he contended that the delay was not unreasonable. If you just look at the facts, I mean, she was very, very diligent, like I said. The first request was informal. The second request was on March 20th when she said that her due date was August 25th. Bensley flatly denied that request. Then on March 15th, she again requested light duty as an accommodation. Michelle Rivera on March 16th emailed. Is this reasonable or not something that we should be deciding as a matter of law? Or is that a jury question? It's a jury question, much like most of these issues are. Speaking of jury questions, the comparator issue, there's issues of fact here on comparators. That's a jury question as well. I have 20 seconds, so I just want to make sure I touch on the other points. Was it possible to work from home? You have the direct supervisor that we deposed, Mr. Bensley, who said he testified. He's the one. Rivera doesn't really know what she does. He testified that she can perform almost all of her job from home. I'm out of time. Thank you very much. Thank you, counsel. We appreciate argument today. That concludes our now afternoon. We will take the case under advisement.